sions, affidavits and other materials show "that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A material fact is one which might affect the outcome of the suit under applicable law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 2510 (1986). No genuine issue exists "unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 2511. Summary judgment may be granted if the evidence is merely colorable or is not significantly probative. *Id.*

When a properly supported motion for summary judgment has been made, the opposing party "must set forth specific facts showing that there is a genuine issue for trial." *Id.* The opposing party is entitled to the benefit of all favorable inferences which can reasonably be drawn from the underlying facts; however, only *reasonable* inferences will be drawn, not every conceivable inference. *DeValk Lincoln Mercury, Inc. v. Ford Motor Co.*, 811 F.2d 326, 329 (7th Cir. 1987).

The taxpayer has the specific burden of proving entitlement to all claimed deductions, and in order to satisfy his burden, he must provide more than unsupported conclusions. See *Welch v. Helvering* [3 USTC ¶1164], 290 U.S. 111 (1933); *Lary v. U.S.* [85-1 USTC ¶9306], 608 F.Supp. 258 (D.C. Ala. 1985). It is a fundamental principle that the taxpayer must prove the nature, character and amount of any claimed expenses or deductions. Specifically, in the case of claimed deductions under Section 212, the taxpayer must come forth with evidence establishing that he incurred a loss due to payment of the ordinary and necessary expenses involved in managing, conserving, or maintaining property. This court believes that the plaintiffs' showing of entitlement to any deduction is woefully inadequate.

First, the only evidence the plaintiffs submit to support their entitlement to a deduction under Section 212 are the affidavits of two general partners, Mr. Wiczer and Mr. Hirn, and a copy of a $45,000 check payable to Leonard Fript, another general partner. The plaintiffs have failed to produce any documentary evidence such as bills, receipts, or cancelled checks which indicate the nature of the use of the funds. Moreover, when asked in United States' Interrogatory Number 3 to whom the money was paid, the plaintiffs responded, "Various creditors of Bellevue Place Partners, Ltd., in varying amounts, which are currently unknown." Thus, the plaintiffs do not have specific knowledge of the use of the $45,000 they claim to be entitled to deduct. Consequently, the plaintiffs have not proven that the $45,000 was used for payment of ordinary and necessary expenses under Section 212 and have not demonstrated that any genuine issue for trial exists on this issue.

This reasoning applies with equal force to the plaintiffs' claimed deduction under Section 165(c)(2). The plaintiffs have not specified any closed or completed transactions, fixed by identifiable events, which evidence the loss as required by the regulations. The only "completed transaction" the court is aware of concerning the $45,000 is Wiczer's payment of the money to Fript. However, this transaction alone does not indicate the existence of a loss or that the payment was made to cover a loss or operating expenses. The plaintiffs have only provided the affidavits of Wiczer and Hirn which contain the conclusory statement that in 1981 Wiczer paid $45,000 of previously accrued operating expenses of Bellevue to support their proposition that the payment was for operating expenses. The plaintiffs have not come forth with any additional evidence upon which this court could conclude that plaintiffs are entitled to a deduction under Section 165(c)(2). Moreover, the court finds that the plaintiffs have not demonstrated that a genuine issue of material fact exists regarding this issue.

Since no genuine issue of material fact exists regarding plaintiffs' claimed deduction under either Section 212 or Section 165, the court grants summary judgment in favor of the defendant.

---

[¶ 9393] **Richard Y.S. Lee, Plaintiff and Counterclaim-Defendant v. United States of America, Defendant and Counterclaimant v. Warren H.L. Leong, Counterclaim-Defendant. Lenore H. Lee, Plaintiff and Counterclaim-Defendant v. United States of America, Defendant and Counterclaimant.**

U.S. District Court, Dist. Hawaii; Civ. 85-0789, Civ. 85-0790, 4/26/89.

[*Code Sec. 6672*]

**Penalties: Failure to collect or pay over withheld tax: Responsible person: Control: Willfulness.**—The president and vice-president of an insolvent corporation with unpaid withholding tax liability had control over the disbursement of corporate funds and the payment of creditors. Accordingly, they were responsible parties who were aware of the

(2)

unpaid taxes and willfully failed to collect or pay over withheld taxes to the government. Thus, they were liable for the 100% penalty assessment under Code Sec. 6672. The wife of the vice-president, a certified public accountant who is the secretary of the corporation and has the authority to countersign checks, lacked authority to decide which creditors were to be paid and was not a responsible party. Back references: ¶ 5569.013 and 5569.014.

Richard Y.S. Lee, 1833 Kalakaua Ave., Honolulu, HI, 96815, pro se, Richard Lee, 1750 Kalakaua Ave., Honolulu, HI, 96826, for plaintiff-counterclaim defendant. Daniel A. Bent, Michael Chun, Assistant United States Attorney, Robert S. Watkins, Department of Justice, Washington, D.C. 20530, for defendant and counter claimant. John R. Williams, Williams & Slaton, 1001 Bishop St., Stanley K. Yamada, Jr., 1188 Bishop St., Honolulu, HI, 96813-3586, Warren Leong, 7248 Kuaehu Pl., Honolulu, HI, 96825, Mervyn Gerson, William Hynhoff, Gerson, Grekin & Wynhoff, 1001 Bishop St., Honolulu, HI, 96813, for counterclaim defendant.

## DECISION AND FINDINGS OF FACT AND CONCLUSIONS OF LAW

KAY, District Judge:

### A. Decision

This matter arises out of penalty assessments filed by the Internal Revenue Service against Richard Lee, Lenore Lee, and Warren Leong, under 26 U.S.C. § 6672, based on payroll taxes of the Hickory Steak House Corporation that were not paid over to the government for the fourth quarter of 1978 and for the first quarter of 1979. Richard Lee and Lenore Lee brought suit against the government for a refund of $75.00 paid toward the amount assessed, and abatement of the tax liability. The United States counterclaimed against the Lees and Mr. Leong and seeks to hold them jointly and severally liable for the sum of the unpaid taxes and the accrued interest. The government contends that the three individuals were "responsible" parties under section 6672 and that their failure to collect, account for, and pay over the taxes was "willful".

The court, after trial without a jury, concludes that Ms. Lee is not liable under section 6672 for the delinquent taxes because she was not responsible party; in particular, she did not have control over which creditors were to be paid. Warren Leong and Richard Lee are liable for the full amount assessed by the Internal Revenue Service because they were responsible persons within the Hickory Steak House Corporation and their failure to pay over the withheld taxes was willful. This decision is based upon the specific findings of fact and conclusions of law, as set forth below.

### B. Findings of Fact

1. Richard Lee, Lenore Lee and Warren Leong each reside and are domiciled in the City and County of Honolulu, Hawaii. (Stipulation of Undisputed Facts, dated January 9, 1989, hereinafter "Stipulation")

2. Richard Lee and Lenore Lee were married in June of 1970. (Stipulation) Since 1984, the Lees have been separated. (Testimony of L. Lee) During the relevant period, Mr. Lee was an attorney and a certified public accountant. Ms. Lee also was a certified public accountant. (Stipulation)

3. In August 1977, Da Kalua Pit Corporation was incorporated under the laws of the State of Hawaii. Initially, the shareholders of Da Kalua Pit Corporation were Richard Lee, Warren Leong, Foster Lau, Jane Hu, (Lenore Lee's mother), and Hawaii Resort Industries, and each owned a 20 percent interest. After Da Kalua Pit Corporation relinquished its lease with Hawaii Resort Industries in about July 1978, Mr. Lee, Mr. Leong, Ms. Lau and Mrs. Hu each owned 25 percent of the stock of Da Kalua Pit Corporation. The shareholders were also directors of Da Kalua Pit Corporation. Mr. Lee was Da Kalua Pit Corporation's president, and chief operating officer. Warren Leong was its vice president. Lenore Lee was its secretary. (Stipulation)

4. In May 1978, Mr. Lee and Mr. Leong negotiated and acquired on behalf of Da Kalua Pit Corporation all of the stock of an existing Hawaii corporation called Mediterrania Corporation for $90,000. The name of the corporation was shortly thereafter changed to Hickory Steak House Corporation (hereinafter "HSH"). HSH thus became a wholly-owned subsidiary of Da Kalua Pit Corporation. (Stipulation)

5. Mr. Leong was the president of HSH, Mr. Lee was its vice president, and Mrs. Lee was its secretary. The directors of Da Kalua Pit Corporation—Mr. Leong, Mr. Lee, Ms. Hu, and Ms. Lau also became the directors of HSH. (Stipulation)

6. From October 1977 until July 1978, Da Kalua Pit Corporation operated a restaurant called the Da Kalua Pit. During this time Mr. Lee oversaw the entire operation. (Stipulation)

7. The main asset of HSH initially was a leasehold, acquired in the purchase of the Mediterrania Corporation, on a restaurant property formerly known as the Mad Greek. Da Kalua Pit Corporation, through HSH, sought to renovate the property and operate a restaurant and nightclub under the name Hickory Steak House. Renovations were done between May and August 1978 and were overseen by Mr. Leong. (Stipulation)

8. Mr. Leong and Mr. Lee acquired on behalf of HSH a loan for $140,000.00 from Amfac Financial. $90,000.00 of this money was used to purchase the stock of Mediterrania Corporation


and the remaining $50,000.00 was applied towards renovation and opening costs. Both Mr. Leong and Mr. Lee personally guaranteed the Amfac Financial loan and pledged certain real property as collateral. (Stipulation)

9. Prior to August, 1978 a second loan for $65,000 was acquired by Mr. Leong, on behalf of HSH, from Rainbow Finance, a corporation owned by Richard Lee's family. (Testimony of R. Lee and Leong) The loan was guaranteed by Mr. Leong personally. By the time the restaurant opened, Mr. Leong had invested about $175,000 of his own money into the business. (Testimony of Leong)

10. In August 1978, Da Kalua Pit Corporation opened the Hickory Steak House restaurant and discontinued its restaurant business known as Da Kalua Pit, having given up its lease. (Stipulation) David Char was hired by Richard Lee to manage the restaurant's bar. He formerly was an employee at Da Kalua Pit. Robert Shinsado was hired by Mr. Lee and Mr. Leong as the restaurant manager. Richard Lee purchased the cash register system for the restaurant and checked on its operation every day for the first month. (Testimony of R. Lee)

11. The restaurant initially had four different corporate checking accounts at the Bank of Hawaii. The accounts, and the individuals authorized to write checks on each account are identified as follows.

| Bank Account | Date Opened | Signatory Authority |
|---|---|---|
| Bank of Hawaii (Main acct.) #01-085662 | 6/19/78 | Mr. Leong or Mr. Lee until 9/12/78; thereafter Mr. Leong and either Mr. or Mrs. Lee |
| Bank of Hawaii (Petty cash) #01-085670 | 6/19/78 | Mr. Leong or Mr. Lee until 9/12/78; thereafter, Mr. Leong and either Mr. and Mrs. Lee |
| Bank of Hawaii | 9/25/78 | Mr. Leong, Mr. Lee, Dorothy or Gordon Guy |
| First Hawaiian Bank (Master Charge) | 6/27/78 | Mr. Leong or Mr. Lee |

(Stipulation)

For a period of time during 1978, Mr. Lee's personal secretary, Janis M.Y. Goo, also had signatory authority on Bank of Hawaii account #01-085670, which was used for petty cash. (Testimony of Leong and Exhibit 3)

12. HSH maintained a payroll system with First Hawaiian Bank. Information from employee time cards was transferred to transmittal sheets which were in turn given to First Hawaiian Bank. The bank then processed the information in a computer, computed the payroll taxes and printed net payroll checks and a summary sheet listing the total gross wages, the total taxes withheld and net wages. Net payroll checks were issued if there were sufficient funds in the main corporate checking account, #01-085662, or if HSH deposited a check into the account. The withheld payroll taxes were not maintained in a separate trust fund account. (Stipulation and testimony of L. Lee)

13. Lenore Lee began work for HSH in mid-August 1978, about the time the restaurant opened. Initially her task was to set up the accounting systems for HSH cash receipts, cash disbursements, and payroll. She was paid a salary of $1,000 per month by HSH. After Lenore Lee set up the systems described above, she trained Jeanette Chun, Warren Leong's sister and secretary, and supervised the billing and accounting work. (Testimony of L. Lee)

14. From August to early November 1978, Lenore Lee worked out of the HSH office on Beretania Street. At that time, Ms. Lee had two young children, ages 2 and 1 to care for. She worked a flexible schedule between her home and the office, on the average of 15-30 hours per week. (Testimony of L. Lee) The HSH office was in the same office space where Mr. Leong's other business concerns were located. The HSH office was placed there because it was close to the restaurant and because the rent was free. (Testimony of Leong)

15. Vendors sent most of the invoices to the Beretania Street address. (Stipulation) The bank statements from the main account were also mailed there. (Exhibit 2) Jeanette Chun, Mr. Leong's secretary, prepared the majority of the checks issued by Hickory Steak House, initially under Lenore Lee's direction. (Testimony of Jeanette Chun and L. Lee) Lenore Lee would review the checks prepared by Chun to see if the amount was owed and then sign them. The checks then went to Leong for his signature and disbursal. (Testimony of L. Lee)

16. Mr. Leong determined which creditors would be paid. (Testimony of Leong, R. Lee, and L. Lee) Jeanette Chun testified that she did not know who made the decisions to pay which creditors, and, in any event, the court finds her testimony was not credible.

¶ 9393

© 1989, Commerce Clearing House, Inc.

17. By early November 1978, Lenore Lee stopped working at the Beretania Street office. Instead, she went to Richard Lee's downtown office where her duties for HSH were limited to setting up a general ledger and fixed asset schedules. She continued to work at her convenience and only about 15 hours per week. (Testimony of L. Lee)

18. The last work Lenore Lee did for Hickory Steak House was in December 1978 or January 1979. Ms. Lee occasionally countersigned checks on the main account through February 1979. (Testimony of L. Lee and Ex. P) Despite her check signing responsibilities, Richard Lee, Warren Leong, and Lenore Lee all testified that she did not have control over which creditors of HSH would be paid and which would not. The court finds the testimony of all three to be credible and truthful on this point. The court especially notes that it was in Mr. Leong's interest to have Ms. Lee found liable for the penalty assessed by the Internal Revenue Service. Thus, Mr. Leong's testimony supporting Ms. Lee's non-liability is particularly credible.

18. Mr. Leong and Mr. Lee had the power to hire and fire employees and to set their salaries. Ms. Lee did not have any such powers.

19. Mr. Lee and Mr. Leong negotiated contracts and ordered supplies for HSH. Ms. Lee did not have any such powers.

20. Ms. Lee did not prepare or sign any corporate tax returns of HSH, including Form 941 (withholding tax) returns which were not filed until months after she stopped working for HSH.

21. Ms. Lee did not control the financial affairs of HSH.

22. As early as August of 1978, HSH was having cash flow problems and could not pay all of its creditors. (Stipulation) The restaurant lost money every month during the relevant time period, at the average rate of $15,000 per month. (Testimony of Leong and R. Lee and L. Lee) Mr. Leong contributed these additional funds to the restaurant as they were needed, and some of this money was repaid by the corporation. (Testimony of Leong and L. Lee and Ex. G) At times, extra funds were required to meet payroll. (Testimony of Leong and Ex. G)

23. Bank of Hawaii checking account number 01-085662 ("BOH Account 1") was HSH's main account. (Testimony of L. Lee, Exs. F-Q and 10) Until September 12, 1978, either Richard Lee or Warren Leong could issue checks on this account under their sole signature. On September 12, 1978, the account was changed so that all checks required the signature of Warren Leong, and either the signature of Lenore Lee or Richard Lee. (Ex. 2)

24. The change in signature authority on the Bank of Hawaii accounts was the result of a mutual agreement between Mr. Lee and Mr. Leong regarding control of HSH. Leong, due to the fact that he was investing the great majority of the money for operations, would be in charge of the HSH funds, while Mr. Lee was to share in the control of HSH through the requirement that he or his wife countersign each check. (Testimony of R. Lee and Leong) The purpose of the Lees' power to countersign checks was "so that Mr. Leong would not run away with the money." (Testimony of R. Lee) According to Mr. Lee, such sharing of control would continue during the transition period until negotiations were finalized for Mr. Leong's acquisition of sole ownership of HSH. (Testimony of R. Lee)

25. In September or October of 1978, Mr. Lee and Mr. Leong met to discuss cash flow problems. At this time they discussed the fact that the withholding taxes were delinquent. (Testimony of R. Lee) By October of 1978, HSH was making selective payments to creditors. Lenore Lee knew that all creditors were not being paid in October and by November she became aware that the withholding taxes were not being paid. (Testimony of L. Lee)

26. Although the invoices went to the HSH office or the restaurant, creditors occasionally telephoned Mr. Lee about payment of their bills. In November of 1978, Mr. Lee requested that Mr. Leong make an overdue payment on the Rainbow Finance loan. As a result, a check was issued under their joint signatures. (Testimony of R. Lee and Ex. M) Similarly, in late January 1979, after receiving demands by Amfac Financial to have its December loan payment made, Mr. Lee telephoned Mr. Leong to request payment. The subsequent loan check was also cosigned by the two men. (Testimony of R. Lee and Ex. F)

27. In November 1978, Mr. Lee wrote a check to HSH at the request of Mr. Leong for $4,300. The check was needed to cover HSH expenses on a temporary basis and Mr. Lee was never paid back the money. (Testimony of R. Lee)

28. In December of 1978, a mechanics lien was filed against HSH. (Ex. 20) This, in turn, triggered a demand by Amfac Financial for payment of its mortgage. At this time, HSH obviously had serious financial difficulties, and all the officers and shareholders of HSH knew or should have know this.

29. Mr. Leong opened two checking accounts for HSH at American Savings Bank on February 16, 1979. Mr. Leong and Jeanette Chu were the joint signatories on the account. (Ex. 4) In March of 1979, the main HSH checking account at Bank of Hawaii received no deposits. (Testimony of Leong and Ex. 19) In the prior three months, an average of $35,000 was deposited in

**89,020**  

U.S. Tax Cases
*Lee v. U.S.*



that account per month. (Exs. X, Y, and Z) During the month of February, 50 deposits were made for a total of $25,000. After March 1, 1979, HSH's main checking account was at American Savings Bank.

30. The Bank of Hawaii checking account remained open in March of 1979. At the beginning of the month, the balance was $1,677.90. The closing balance on April 1, 1979 was $9.64. During this period of time, Mr. Lee was still an officer, director and shareholder of HSH, and the signature of he or his wife was required on all checks from the Bank of Hawaii account. (Ex. 19)

31. On May 18, 1979, Mr. Lee and the other shareholders of HSH finalized in writing an agreement to transfer all their stock to Mr. Leong in exchange for $50,000. (Ex. JJ) Mr. Lee testified that an oral agreement was reached some time earlier. None of the shareholders ever received any money as a result of the agreement. (Testimony of R. Lee) By December, 1979, Mr. Leong had invested a total of $430,000 of his money in the business. (Ex. MM)

32. In a letter to Mr. Leong, dated October 31, 1979, Mr. Lee threatened to take control of HSH if Mr. Leong did not abide by the terms of the May 18, 1979 agreement.

33. In December 1979, Mr. Lee signed an agreement in the capacity of a director of HSH authorizing the corporation to pledge its assets as security on a loan to Mr. Leong.

34. HSH had payroll tax delinquencies for the last quarter of 1978 (October 1, 1978 to December 31, 1979) and for the first quarter of 1979 (January 1, 1979 to March 31, 1979). (Stipulation)

35. On April 14, 1982, the District Director of Internal Revenue made a 100 percent penalty assessment pursuant to 26 U.S.C. Section 6672 against Mr. and Mrs. Lee with respect to the withheld payroll taxes of HSH for the following payroll periods and in the following amounts:

| Payroll Periods | Amount |
|---|---|
| October 1, 1978 to December 31, 1978 | $11,471.23 |
| January 1, 1979 to March 31, 1979 | 7,251.74 |
| Total | $18,722.97 |

(Stipulation)

36. On May 16, 1983, a 100 percent penalty assessment was made against Mr. Leong for the same payroll periods and amounts previously assessed against Mr. and Mrs. Lee. In addition, Mr. Leong was assessed $5,986.76 for the last quarter in 1981 and the first two quarters of 1982.

37. Richard Lee and Lenore Lee each filed with the Internal Revenue Service a claim for refund and abatement of taxes in the amount of $25,440.72. On February 12, 1985, the District Director mailed to them a formal notice of disallowance of the claim for refund. (Stipulation)

38. The Lees thereafter initiated the instant suits for refund of a portion of the 100 percent penalty. The United States counterclaimed against the Lees and Mr. Leong for the unpaid portion of the 100 percent penalty allegedly due. (Stipulation)

39. On January 10, 1989, a stipulation and entry of partial judgment was entered between Mr. Leong and the government in which Mr. Leong is held liable in the sum of $5,986.76 for the 1981-1982 assessments.

40. To the extent that these Findings of Fact constitute conclusions of law, they shall be so considered.

### C. *Conclusions of Law*

1. This court has subject matter jurisdiction over this case pursuant to 28 U.S.C. §§ 1340, and 1346.

2. Venue is proper pursuant to 28 U.S.C. §§ 1396, and 1402.

3. 26 U.S.C. §§ 3102 and 3402 require an employer to deduct, withhold, and pay over to the government federal income and social security taxes from the wages of its employees.

4. 26 U.S.C. § 7501 provides that such taxes are to be held in a "special fund in trust for the United States" prior to payment. 26 U.S.C. § 6672, in turn, imposes a 100% penalty on persons responsible for the nonpayment of corporate payroll taxes:

> Any person required to collect, truthfully account for, and pay over any tax imposed by this title who willfully fails to collect such tax or truthfully account for and pay over such tax, or willfully attempts in any manner to evade or defeat such tax or the payment thereof, shall in addition to other penalties provided by law, be liable to a penalty equal to the total amount of the tax evaded, or not collected, or not accounted for and paid over.

5. Section 6671(b) defines the "person" in section 6672 as "an officer or employee of a corporation . . . under a duty to perform the act in respect of which the violation occurs." To be liable, the employee or officer need not be in a position to perform all of the enumerated functions. See *Slodov v. United States* [78-1 USTC ¶9447], 98 S.Ct. 1778, 1787 (1978); *Kappas v. United States* [83-2 USTC ¶9683], 578 F.Supp. 1435, 1439 (D.C. Cal. 1983). Thus, one who willfully fails to either collect, account for, or pay over the taxes will be liable. *George v.*

¶ 9393

©1989, Commerce Clearing House, Inc.

United States [87-2 USTC ¶ 9384], 819 F.2d 1008, 1011 at n.3 (11th Cir. 1987).

6. There are two requirements for liability under § 6672. The officer or employee must be found to be a "responsible party", and the failure to collect, account for and pay over the taxes must be "willful". *Maggy v. United States* [77-2 USTC ¶ 9686], 560 F.2d 1372, 1374 (9th Cir. 1977), *cert. denied*, 439 U.S. 821 (1978). More than one person within the corporation can be found "responsible" and liable under Section 6672. *Roth v. United States* [86-1 USTC ¶ 9172], 779 F.2d 1567, 1571 (11th Cir. 1986); *Kappas v. United States*, 578 F.Supp. at 1441. When more than one person is liable under § 6672 for the assessment penalty, the liability is joint and several. *Id.*; *Brown v. United States* [79-1 USTC ¶ 9285], 591 F.2d 1136 (5th Cir. 1979).

7. The test for determining whether a person is responsible under § 6672 is "essentially a functional one, focusing upon the degree of influence and control which the person exercised over the financial affairs of the corporation and, specifically, disbursements of funds and the priority of payments." *Gephart v. United States* [87-1 USTC ¶ 9319], 818 F.2d 469, 473 (6th Cir. 1987). This control over corporate funds is required because Section 6672 was "designed to cut through the shield of organizational form and impose liability upon those actually responsible for an employer's failure to withhold and pay over the tax." *Turner v. United States* [70-1 USTC ¶ 9282], 423 F.2d 448, 449 (9th Cir. 1970).

8. Plainly stated, the term "responsible person" means "one who has the final word on which bill should or should not be paid. *Maggy v. United States*, 560 F.2d at 1374 citing, *Bloom v. United States* [59-2 USTC ¶ 9772], 272 F.2d 215 (9th Cir. 1959), *cert. denied*, 363 U.S. 803 (1960). The word "final" in this context means "significant", not exclusive control over such matters. *Dudley v. United States* [70-2 USTC ¶ 9520], 428 F.2d 1196 (9th Cir. 1970). See also, *Kappas v. United States*, 578 F.Supp. at 1435 ("responsibility" is "simply the ability to direct or control the payment of corporate funds.")

9. The different factors which may be relied upon in determining who is a responsible person include: 1) the duties of the officer as outlined in corporate by-laws; 2) the ability of the individual to sign the corporate checks; 3) the identity of the officers, directors and shareholders of the corporation; and 4) the identity of the persons in control of the corporation's financial affairs. *Gephart v. United States*, 818 F.2d at 473, *citing, Braden v. United States* [70-2 USTC ¶ 9554], 318 F.Supp. 1189, 1194 (S.D.Ohio 1970), *aff'd*, [71-1 USTC ¶ 9428], 442 F.2d 342 (6th Cir.), *cert. denied*, 404 U.S. 912 (1971). See also, *Sadowski v. United States*, 88-2 USTC ¶ 9559 (1988).

10. For a responsible person to "willfully" fail to collect, account for, or pay over taxes, he or she need not have an intent to defraud the government or any other evil motive. *Dudley v. United States* [70-2 USTC ¶ 9520], 428 F.2d 1196 (9th Cir. 1970). To be willful, the failure to collect and pay over the third party taxes must be an intentional, voluntary, and conscious act, *Kappas v. United States* [83-2 USTC ¶ 9683], 578 F.Supp. 1435 (C.D.Cal. 1983), or an act made in "reckless disregard" of the known or obvious risk that the taxes will not be paid to the government. *Id.*; *Kalb v. United States* [74-2 USTC ¶ 9760], 505 F.2d 506 (2nd Cir. 1974), *cert. denied*, 421 U.S. 979 (1975); *Godfrey v. United States* [84-2 USTC ¶ 9974], 748 F.2d 1568 (C.A.Fed. 1984). Mere negligence, or nonreckless ignorance of the failure to pay over taxes, however, does not constitute a willful act. *Teel v. United States* [76-1 USTC ¶ 9190], 529 F.2d 903 (9th Cir. 1976); *Feist v. United States* [79-2 USTC ¶ 9635], 607 F.2d 954 (Ct. Cl. 1979).

11. Withholding taxes are to be paid on a quarterly basis. As the employer withholds taxes from its employees, however, a contingent liability is created. The person who is responsible for paying over the withholding taxes to the government is also contingently liable at that point in time. *Teel v. United States*, 529 F.2d at 906.

12. An individual who ceases to be a responsible person during a quarter is liable for the amount of taxes withheld while he or she was still responsible. *Maggy v. United States* [77-2 USTC ¶ 9686], 560 F.2d 1372, 1374-76 (9th Cir. 1977), *cert. denied*, 439 U.S. 821 (1978); *Mulee v. United States* [86-2 USTC ¶ 9783], 648 F.Supp. 1181, 1184-86 (N.D.Ill. 1986); but *cf., Brown v. United States* [79-1 USTC ¶ 9285], 591 F.2d 1136, 1138-1140 (5th Cir. 1979) (when control over the finances of a company switches from one person to another during a quarter, both can be held liable for the entire quarter).

13. The assessment of the penalty under § 6672 is presumptively correct. *United States v. Molitor* [64-2 USTC ¶ 9820], 337 F.2d 917 (9th Cir. 1964). Through this presumption, the government may establish a prima facie case of liability, and the amount of the penalty by offering into evidence a certified copy of the assessment. *Psaty v. United States* [71-1 USTC ¶ 9346], 442 F.2d 1154, 1159 (3rd Cir. 1971). Once the assessment is admitted into evidence, the burden of proof shifts to the taxpayer to establish by a preponderance of the evidence that he or she was not a responsible employee or officer, or that the failure to collect, account for, or pay the withholding tax was not willful. *United States v. Stonehill* [83-1 USTC ¶ 9285], 702 F.2d 1288, 1293-94 (9th Cir. 1983).

14. The court concludes that Lenore Lee has met her burden of proof and shown that she was

**89,022**    U.S. Tax Cases
*Lee v. U.S.*

not a responsible person within the HSH organization and therefore she is not liable under 26 U.S.C. § 6672. Ms. Lee was neither an investor nor a director in HSH, or its parent, Da Kalua Pit Corporation. Although she was secretary of HSH, and after June 19, 1978 she had the authority to countersign checks on the main HSH Bank of Hawaii account, she did not have any authority to decide which creditors were to be paid.

15. The court concludes that Warren Leong has not met his burden of proof. First of all, Mr. Leong was a responsible person within the organization. He was the President of HSH and he contributed the vast majority of the funds invested in the restaurant. These contributions were made on a regular basis to make up for the restaurant's losses, and to pay creditors. After June 19, 1978, his signature was required for all checks on the main HSH account, and from this date he had the most significant control over which bill should or should not be paid. This court also concludes that Mr. Leong's failure to collect, account for, and pay over the withheld taxes was willful. As Mr. Leong was aware that the withholding taxes were not being paid during the third quarter, and that his own money was required on a regular basis to pay essential bills, including payroll, this court does not find credible his testimony that he was unaware that the taxes were not paid. Even assuming that the failure to pay the taxes was not intentional, the court concludes that Mr. Leong acted in reckless disregard of the known risk that the taxes were not being paid. Mr. Leong is therefore liable for the 100% penalty for the last quarter of 1978 and the first quarter of 1979.

16. The court concludes that Mr. Lee has not met his burden of proof to demonstrate that he was not a responsible person for the last quarter of 1978, and for the first quarter of 1979. During this period, Mr. Lee was the President and chief operating officer of Da Kalua Pit Corporation, and the vice-president of HSH. He was also an investor in the company and a guarantor of one of the HSH loans. During the relevant period, Mr. Lee had significant control over the finances of HSH. His ability to determine which creditors should be paid is evidenced by the agreemet in effect on June 19, 1978 which required that he or his wife countersign all checks on the main HSH account, and the payment of bank loans in December, 1978 and January, 1979 by HSH upon his request. Mr. Lee had significant control over HSH finances until the end of March, 1979. Although Mr. Leong opened up checking accounts at American Savings Bank on February 16, 1979 and Mr. Leong and his secretary Jeanette Chun were the only persons allowed to sign checks on those accounts, the Bank of Hawaii account, over which Mr. Lee had signatory authority, still remained open throughout the month of March. During this period, over $1400 in checks were paid out of that account. Furthermore, the agreement to sell Mr. Leong all the outstanding shares of HSH stock was not yet in final written form.

17. The court also concludes that Mr. Lee's failure to pay over the taxes during this period was willful. He testified that he was aware in October 1978 that payroll taxes were not being paid, and that he knew the restaurant was losing money during the entire relevant period and that its creditors were not being paid. Furthermore, after the mechanics lien filed against HSH in December 1978 and Amfac Financial made a demand for payment, Mr. Lee knew or should have known that HSH had serious financial problems. The court does not view his testimony that he was unaware that the taxes were delinquent as credible, and in any event, if he was not directly knowledgeable, Mr. Lee's control over HSH finances was exercised in reckless disregard of the known risk that the taxes were not paid. Mr. Lee is therefore liable for the 100% penalty assessment for the whole third quarter of 1978, and for the first quarter of 1979 between January 1, 1979 and March 1, 1979.

18. Richard Lee and Warren Leong are jointly and severally liable for the penalties assessed for the fourth quarter of 1978 and for the first quarter of 1979. *Kappas v. United States*, 578 F.Supp. at 1441.

19. Judgment is to be entered in favor of Lenore Lee in her suit against the United States in the sum of $75.00 plus lawful interest. In addition, all tax liability arising out of the Hickory Steak House payroll taxes is abated and the government's counterclaim is denied.

20. Judgment is to be entered in favor of the United States on its counterclaim against Walter Leong in the sum of $18,722.97 plus lawful interest.

21. Judgment is to be entered in favor of the United States on its counterclaim against Richard Lee in the sum of $18,722.97 plus lawful interest, but minus any credits, payments, or overpayments applicable to his outstanding tax liability.

22. To the extent that these Conclusions of Law constitute findings of fact, they shall be so considered.

¶ 9393

©1989, Commerce Clearing House, Inc.